UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JANUARY A.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:21-cv-02553-SEB-DML |
| | ) |
| KILOLO KIJAKAZI Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**ORDER OVERRULING DEFENDANT'S OBJECTIONS TO
THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff January A. petitioned the court for judicial review of the Commissioner of the Social Security Administration's final decision finding her not disabled based on the information set forth in her application filed in May of 2018. The case was referred to Magistrate Judge Debra McVicker Lynch for her decision and recommendation. On August 9, 2022, Magistrate Judge Lynch issued a Report and Recommendation reversing and remanding the Commissioner's decision, finding the Administrative Law Judge's evaluation of January's subjective symptoms to be patently wrong. The Commissioner has objected to the Magistrate Judge's Report and Recommendation, which objections we now address.

---

[1] To protect the privacy interests of claimants for Social Security benefits, the Southern District of Indiana has chosen to use only the first name and last initial of non-governmental parties in its Social Security review opinions. The Plaintiff will therefore be referred to by her first name.

I.   **FACTUAL BACKGROUND**[2]

January was thirty-five years of age at the time she applied for disability benefits with a history of neck and back disorders. On December 24, 2017, January was involved in a "rollover car accident," ultimately requiring surgery to relieve cervical compression on January 11, 2018.[3] Docket No. 15, at 5. Neurosurgeon Dr. Shannon McKanna performed "an anterior cervical corpectomy at C4 and anterior cervical diskectomy and decompression with fusion at C5-C6 and C6-C7."[4] *Id.* Nearly a full year following her surgery, on January 9, 2019, January returned to Dr. McKanna for a follow up exam, who noted that January's outcome from her surgery had "not been ideal in terms of residual severe neck pain and residual neuropathic pain and weakness in the arms and legs." *Id.* at 6. However, an MRI of her cervical spine showed "excellent decompression with no residual stenosis" and "[v]ery mild stenosis at C2- 3, which is unchanged." *Id.* An MRI of the lumbar spine revealed unchanged lumbar spondylosis with severe degenerative disc disease at L2-3 and L3-4 with right greater than left nerve root impingement." *Id.* Overall, Dr. McKanna was pleased with the outcomes from the surgery, but expressed no

---

[2] The relevant evidence of record is amply set forth in the parties' briefs as well as the ALJ's decision and need not be repeated here. Specific facts relevant to the court's disposition of this case are discussed below.

[3] Her MRI had revealed "quite severe" central stenosis, which occurs "when the space inside the backbone is too small, . . . put[ting] pressure on the spinal cord and nerves that travel through the spine." Docket No. 15, at 5 n.4. Moreover, the MRI of her cervical spine "showed multilevel degenerative spondylosis with disk herniations," and spondylosis is a "condition in which there is abnormal wear on the cartilage and bones of the neck (cervical vertebrae)." *Id.* at 5 n.4

[4] "A corpectomy is a procedure that removes damaged vertebrae and intervertebral discs that are compressing the spinal cord and spinal nerves." *Id.* at 6 n.5. "Diskectomy is surgery to remove the damaged part of a disk in the spine that has its soft center pushing out through the tough outer lining." *Id.*

2

surprise that January was still experiencing residual neuropathic pain and neck pain because "[t]he intention of the surgery was not to deal with her chronic pain issues but rather [to] decompress the spinal cord." *Id.* at 6−7. Dr. McKanna did not believe any additional neck or lower back surgery would be helpful. Though January complained that her back was the main source of her pain, Dr. McKanna reported that January was experiencing "more of a global pain syndrome that affects all extremities relatively equally." *Id.* Dr. McKanna recommended an epidural steroid injection and an Electromyography, or "EMG," which is a diagnostic procedure to assess the health of muscles and the nerve cells that control them, and "can reveal nerve dysfunction, muscle dysfunction or problems with nerve-to-muscle signal transmission." *Id.* at 7 n.7.

On January 24, 2019, January consulted with Dr. Emma Nordstrom, reporting on her chronic neck and back pain, although a physical examination of her neck and back disclosed normal conditions. Two weeks thereafter, on February 5, 2019, January received an epidural steroid injection. January returned to Dr. Nordstrom on August 19, 2019, primarily for treatment of her anxiety and depression, though January also mentioned that she had "been unemployed related to chronic pain." *Id.* at 7. Dr. Nordstrom prescribed January Cymbalta to treat her depression and chronic pain.

On January 6, 2020, January returned to Dr. Nordstrom complaining of "bilateral leg numbness, increased pain, increased weakness, throbbing in her arms, lack of sensation when walking, and an inability to lift her right leg." *Id.* at 8. January reported pain in her neck that radiated down her right arm multiple times per day and for several hours, throbbing and numbness in her hands, right arm weakness, low back pain, weakness in

3

legs when standing and doing chores, numbness of her anterior thighs, and tingling from her knees to her toes. "On exam, January had normal strength in the upper and lower extremities but had decreased vibratory sensation in the right upper and right lower extremities, and Dr. Nordstrom was unable to illicit bicep reflexes." *Id.* January also experienced minimal tenderness over the midline lumbar spine, limited ability to lateral bend and rotate to the right, and an inability to walk on heels and toes. January was diagnosed with cervical radiculopathy and lumbar radiculopathy, among other conditions.[5] Dr. Nordstrom noted that January's pain management injections had apparently failed, and that her various adverse symptoms had progressed. Dr. Nordstrom thus ordered repeat testing and physical therapy for transcutaneous electrical nerve stimulation.[6] A treatment note from this visit also indicates that an EMG showed mild left carpal tunnel syndrome.

    On March 12, 2020, January was seen by nurse practitioner Donna Purviance for severe lower back pain, cervical pain, and arm and leg weakness/numbness. January reported taking Norco for pain. Purviance made note of a conversation she had with January about chronic pain, her previous surgery, and smoking cessation. She also noted that January complained of neurogenic claudication.[7] Purviance explained to January that

---

[5] "Radiculopathy describes a range of symptoms produced by the pinching of a nerve root in the spinal column. The pinched nerve can occur at different areas along the spine (cervical, thoracic or lumbar). Symptoms of radiculopathy vary by location but frequently include pain, weakness, numbness and tingling." *Id.* at 8 n.8.

[6] "TENS Units, or transcutaneous electrical nerve stimulation, also known as Electrotherapy, has been used by physical therapists since the 1980s to achieve the goal of pain relief whether their patients have acute pain or are trying to reduce chronic pain." *Id.* at 8 n.9.

[7] "Neurogenic claudication is typically caused by spinal stenosis, which is sometimes called pseudoclaudication. This is a narrowing of the space around your lower spine, which can put

4

her obesity and smoking status prevented her from having lumbar surgery, and that smoking often contributes to spinal cord deterioration after injury. At this visit, Purviance referred January to Dr. Raheleh Rahimi Darabad, with whom January spoke by phone on April 2, 2020, to discuss chronic pain management. January reportedly told Dr. Darabad that Lyrica was more effective than gabapentin and that she was taking Tylenol daily. It was noted in her record that multiple epidural steroid injections and medial branch blocks in the cervical and lumbar spine had not been effective in alleviating her back pain. After her discussion with Dr. Darabad regarding available treatment options, January chose to proceed with installation of a pain pump.[8] Dr. Darabad informed January that she would be weaned off her prescriptions once she was "cleared for a pain pump." *Id.* at 10. Dr. Darabad also spoke with January about smoking cessation, explaining that "smoking makes chronic pain worse and makes [the] body resistant to pain medications." *Id.* January followed up with Dr. Darabad on May 4, 2020, reporting that she mowed grass the day before her appointment, which had significantly aggravated her pain. Dr. Darabad increased the frequency of her Norco dosages.

### A. PROCEDURAL HISTORY

---

pressure on your spinal cord directly. It can also compress the blood vessels around the spine, depriving it of oxygen-carrying blood. Either of these two possibilities can cause pain that starts in your lower back and continues down your legs, as well as weakness, tingling or numbness in your legs and feet." *Id.* at 9 n.11.
[8] "A 'pain pump' is a method of giving medication directly to your spinal cord. The system uses a small pump that is surgically placed under the skin of your abdomen. The pump delivers medication through a catheter to the area around your spinal cord." *Id.* at 10 n.12.

Six months following her surgery by Dr. McKanna, on May 15, 2018, January filed for disability benefits, alleging that she had been disabled since December 24, 2017, the date of her rollover car accident. She later amended her onset date to a year later, on December 30, 2018. Her disability claim was denied initially on September 26, 2018, and upon reconsideration on March 5, 2019. On April 11, 2019, January requested a hearing, which Administrative Law Judge ("ALJ") Edward Kristof conducted in two parts: the first session on July 6, 2020, and an additional session on December 21, 2020. At her first session, January testified that she had "really not been driving for just about a year." *Id.* at 11. She stated that she ordinarily drove only two days per week—at the very most—because she has problems with her right arm and right leg going numb. January discussed her cervical spine issues, describing the pain to radiate down her arms. She stated that she cannot reach up over her head anymore and that typing and doing paperwork caused numbness in her hands. She also told the ALJ that she had problems holding onto objects; the night before the hearing she had dropped her plate of food at dinner because she lost feeling in her hands. January stated she experienced constant low back pain, which sometimes radiated across the center of her back and down her legs.

At her second hearing on December 21, 2020, medical expert Dr. Jared Frazin testified concerning January's history of neck and lumbar issues, while noting that "she's had normal motor exam" and that she has not exhibited "objective weakness on physical exam." *Id.* Dr. Frazin also noted abnormal sensory exams dating from 2018, explaining that he had not seen abnormal sensory findings since the amended onset date. Dr. Frazin further testified that, "regarding carpal tunnel, it was noted to be mild on EMG, but no

6

physical findings and not addressed in any of the medical records." *Id.* He also stated that January "doesn't really have any loss of motor function." *Id.* In his opinion, January was capable of sedentary work but that he would "limit hand controls to frequent on both sides." *Id.* Dr. Frazin also stated that January does not require limitations with handling, fingering, or feeling. When January's counsel asked Dr. Frazin about medical records suggesting that "the fusion of [January's] cervical spine is not solid," Dr. Frazin explained that the records "only said it wasn't 100% solid at C6-7, but [he] did not think that was the cause of the pain." *Id.* Dr. Frazin highlighted medical records from March of 2020 showing that January's motor function was normal.[9] And he testified that he "didn't see any documentation of any loss of grip or motor functioning of hands or fingers." *Id.*

In a decision issued on March 2, 2021, the ALJ ruled that January was not entitled to disability insurance benefits. Applying the five-step analysis employed in determining eligibility for disability benefits, the ALJ determined initially that January, who has relevant work experience as a service dispatcher, had not engaged in "substantial gainful activity since December 30, 2018, the amended alleged onset date." Docket No. 7-2, at 18. At the second step, the ALJ determined that January has the following severe medically determinable impairments: "residuals of cervical spine injury in motor vehicle

---

[9] The court "acknowledges the significance of Dr. Frazin's expert testimony at the supplemental hearing. However, Dr. Frazin's testimony was based on a review of the objective medical evidence; he provided very little discussion about January's subjective symptoms. As discussed below, the ALJ had a duty to sufficiently consider January's subjective symptoms under SSR 16-3p. While Dr. Frazin had access to a more complete medical record, provided specific rationale for [his] opinion, along with citations to specific findings in record to support his conclusions, and the doctor was subjected to cross examination by the claimant's attorney, the significance of his testimony does not save the ALJ's deficient analysis of January's subjective symptoms." *Id.* at 17, n.14 (internal quotation marks and citations omitted).

accident, with history of cervical discectomy and fusion; degenerative disc disease and facet arthritis of the lumbar spine; failed back syndrome; and obesity." *Id.* At step three, the ALJ concluded that despite January's "diagnosed impairments, the medical evidence does not document listing level severity and no acceptable medical source has mentioned findings equivalent in severity to the criteria of any listed impairment, either individually or in combination." *Id.* At step four, the ALJ determined January has the residual functional capacity (RFC) to perform sedentary work, "except [she] is limited to no more than frequent use of hand controls bilaterally; [she] is limited to frequent handling, fingering, and feeling with the bilateral upper extremities." *Id.* at 19. The ALJ also determined that January "is unable to engage in work tasks involving constant movement of the neck, such as tracking moving objects on a conveyor belt or moving vehicular traffic." *Id.* at 19−20. "The ALJ found at step four that January could perform her past relevant work as a service dispatcher as generally performed." Docket No. 15, at 12. The ALJ also made an "alternative step five finding, based on the testimony of a vocational expert, January's vocational factors, and her RFC, that January could perform the following jobs that existed in significant numbers in the national economy: address clerk, document clerk, and account clerk." *Id.* at 12−13.

The Appeals Council for the Social Security Administration ("SSA") denied January's request for review on August 4, 2021, after which January filed a timely civil action. On August 9, 2022, Magistrate Judge Lynch filed her Report and Recommendation reversing and remanding the administrative determination, and the recommendation was timely

8

objected to by the Commissioner. We now consider January's appeal, and the Commissioner's objections in our *de novo* review.

## II.    DISCUSSION AND DECISION

January asserts two errors with the ALJ's decision. First, that the ALJ erred in assessing her symptoms under Social Security Regulation 16-3p because he summarized only select portions of the medical record, did not mention January's subjective statements regarding her impairments, and provided no reasoning to discredit her statements. Second, the ALJ erred in assessing evidence related to her difficulties with hand usage; thus, his conclusion that January is able to perform sedentary work with frequent use of her bilateral hand usage is erroneous.

### A. STANDARDS OF REVIEW

As did the Magistrate Judge, we also limit our review of the decision of the ALJ so as not to "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [our] own judgment for that of the Commissioner." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Under this deferential standard of review, we must affirm if no error of law occurred and the ALJ's factual findings are supported by substantial evidence. "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). When accepting or rejecting specific evidence of a disability, the ALJ is required to articulate a minimal, but legitimate, justification. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). The ALJ need not address every piece of evidence in

his decision, but he cannot ignore a line of evidence that undermines the conclusions he made, and he must trace the path of their reasoning and connect the evidence to his findings and conclusions. *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012*); Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). We confine the scope of our review to the rationale offered by the ALJ. *See SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Tumminaro v. Astrue,* 671 F.3d 629, 632 (7th Cir. 2011). An ALJ's evaluation is entitled to special deference from the court unless it is "patently wrong." *Engstrand v. Colvin*, 788 F.3d 655, 660 (7th Cir. 2015).

In analyzing a party's specific objections to elements of a Magistrate Judge's Report and Recommendation, the district court reviews those elements *de novo,* determining for itself whether the Commissioner's decision as to those issues is supported by substantial evidence or was the result of an error of law. Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b)(1)(C). *De novo* review requires a re-examination of the case with a fresh set of eyes and "an independent judgment of the issues." *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1210 (7th Cir. 1984). After review, the court is empowered to adopt, reject, or modify the recommendations and/or findings by the Magistrate Judge. Fed. R. Civ. P. 72(b). The objections raised by the Commissioner have been correctly and timely interposed.

### B.  SUBJECTIVE SYMPTOMS

In evaluating an individual's alleged symptoms, the SSA must first determine whether the individual has a medically determinable impairment that could reasonably be

expected to produce the individual's alleged symptoms. Once such an impairment has been established, the "intensity, persistence, and limiting effects of an individual's symptoms" is then evaluated to determine the extent to which an individual's symptoms limit their ability to perform work-related activities. SSR 16-3p; *see also* 20 C.F.R. § 404.1529. In conducting this first step, "[t]here must be objective medical evidence from an acceptable medical source that shows [an individual has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence of [the individual's] pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that [the individual is] disabled." 20 C.F.R. § 404.1529(a). In evaluating the intensity and persistence of an individual's symptoms, "including pain, [the SSA] will consider all of the available evidence, including [the individual's] medical history, the medical signs and laboratory findings, and statements about how [the individual's symptoms affect [them]." *Id.* Social Security regulations require consideration of an individual's statements about their symptoms at both steps of this analysis.

Here, the ALJ concluded that January's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [January's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." Docket No. 7-2, at 21. Magistrate Judge Lynch determined that "the ALJ's evaluation of

11

January's subjective symptoms was patently wrong." Docket No. 15, at 14. In criticizing his evaluation, Magistrate Judge Lynch noted that "the ALJ never referenced January's complaints about pain, weakness, and numbness in her hands, arms, and legs." Docket No. 15, at 15. Yet the administrative record indicates that January raised several complaints reflecting such symptoms:

- January's "outcome has not been ideal in terms of residual severe neck pain and residual neuropathic pain and weakness in the arms and legs." (R. 1042).
- "Pain is located in her neck and radiates down her right arm. Occurring multiple times a day and lasting for hours. Hands will throb with numbness; (R>L). She has noted more weakness in her right arm. Activity worsens the symptoms. Rest does not improve symptoms once they start."
- "Pain across low back. Describing weakness in her legs. Has difficulty completing chores [due to] weakness in legs and standing for prolonged periods. She feels like she cannot lift up her right leg when she is trying to get dressed. Has numbness over the anterior thighs. Tingling from her knees to her toes. All these symptoms are intermittent and last for hours."
- "Having severe lower back pain that causes legs to go numb and makes it hard to walk … She also at this time has significant myelopathy with weakness. She subjectively continues to [complain of] arm and leg weakness, dragging the right leg, inability to work, inability to open jars or lift objects."

*Id.* (internal citations omitted). At her first hearing, January provided the following additional testimony:

- "I have been having problems with my right arm going numb. My right leg goes numb."
- "The pain radiates down towards my arms."
- "[Use of my hands for typing or doing paperwork] causes numbness."
- "Well, last night I dropped my whole plate of dinner … I mean we had some people over and I was -- literally just made my plate and went to grab it off the counter and my hands wouldn't close. I couldn't feel them. I couldn't make them function."

- "I do have problems styling [my hair]. It requires my hands to be up over my head and that's usually -- like I said, anything from halfway position to up, there's where I start to lose feeling and numbness."
- "The pain in my low back stays in the specific location and then radiates."
- "I will sometimes then get radiation of pain across the center of my back and down my legs. Once my legs go completely numb, they throb continuous [sic] all day long."
- "I will immediately lose feeling and my legs will go numb and then they'll go cool like as if you put Icy Hot on them, and then they'll come back and it will get really hot and then usually I have trouble using my legs for the rest of the day."

*Id.* at 15−16 (internal citations omitted). "Conspicuously absent from the ALJ's decision, however, is any mention of these alleged symptoms—symptoms that the Commissioner acknowledges January reported on numerous occasions," ruled Magistrate Judge Lynch. *Id.* at 16.

"The ALJ specifically recognized only January's neck and back pain in the decision," and as January correctly asserts, "the ALJ did not even summarize her complaints of arm/hand/leg pain, weakness, and numbness, and he certainly did not provide any analysis of these alleged symptoms or explain if/how these symptoms informed his decision." *Id.* at 16.

With regard to the second step in evaluating the intensity and persistence of alleged symptoms, the ALJ may "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual." SSR 16-3p; *see also* 20 C.F.R. § 404.1529(c)(2). Recognizing that "symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone," and that "symptoms, such as pain, are subjective and

13

difficult to quantify," Social Security regulations do not allow an ALJ to "evaluate an individual's symptoms based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled." SSR 16-3p. If the ALJ "cannot make a disability determination or decision that is fully favorable based solely on objective medical evidence, then [he must] carefully consider other evidence in the record" such as "statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms," including daily activities, medications taken to alleviate pain, and other treatments received. *Id.*

Regardless of any specific objective medical evidence, the ALJ was required to consider January's frequent reports of radicular/neurological symptoms, including pain radiating to the limbs, weakness in the limbs, and numbness. Because the ALJ did not consider these reported symptoms, and because these symptoms bear directly on the ALJ's RFC that found January can perform sedentary work with "frequent use of hand controls bilaterally and "frequent handling, fingering, and feeling with the bilateral upper extremities," the ALJ's decision cannot stand. Docket No. 7-*2,* at 19. "[A]lthough ALJs do not need to address every piece of evidence in the record, an ALJ may not ignore an entire line of evidence contrary to its ruling." *Grotts v. Kijakazi*, 27 F.4th 1273, 1278 (citing *Reinaas v. Saul*, 953 F.3d 461, 467 (7th Cir. 2020)). Here, the ALJ impermissibly ignored an entire line of evidence that was contrary to its final ruling, evidence which the ALJ was required at least to consider when reaching his conclusion. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (explaining that the ALJ "cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that

14

points to a disability finding."); *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003) ("In coming to his decision . . . the ALJ must confront evidence that does not support his conclusion and explain why it was rejected.").

Magistrate Judge Lynch criticized the Commissioner's brief for attempting to sidestep this omission in the ALJ's analysis: "apparently recognizing that the ALJ's decision does not stand on its own, [the Commissioner] attempts to persuade the court with evidence that the ALJ never considered." Docket No. 15, at 19. "The Commissioner's critiques of January's treatment history, regardless of whether they are supported by the record, were not included in the ALJ's decision." *Id.* "This violates the *Chenery* doctrine, which says that the 'Commissioner's lawyers cannot defend the agency's decision on grounds that the agency itself did not embrace.'" *Id.* (quoting *Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012)). "Therefore, the Commissioner cannot advance 'a novel basis for the ALJ's determination' on appeal." *Id.* (quoting *Kastner*, 697 F.3d at 648). "The Commissioner's reliance on evidence that was not included in the decision further illustrates that the ALJ's consideration of January's subjective statements was deficient." *Id.* "Recognizing the various errors that were committed in assessing January's subjective symptoms, this court cannot let the ALJ's decision stand." *Id.* Thus, reversal and remand are required.

### III.   CONCLUSION

Having reviewed *de novo* the Magistrate Judge's analysis and conclusions, we hold, for the same reasons set forth in her report, with which we entirely concur and hereby adopt both as to the cited authorities and related analysis, that the ALJ's evaluation of

January's symptoms was patently deficient and thus patently wrong. Accordingly, the Commissioner's objections to the Report and Recommendation of the Magistrate Judge lack merit and her objections are **OVERRULED**. The recommendations set forth in the Magistrate Judge's Report and Recommendation [Docket No. 15] are hereby **ADOPTED** in their entirety. Accordingly, the Commissioner's decision that January was not disabled is **REVERSED** and the case is **REMANDED** for further proceedings in line with this decision.

   IT IS SO ORDERED.

Date: 9/29/2022

_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Eric Harris Schepard
Office of the Regional Chief Counsel Region V
eric.schepard@ssa.gov

Julian Clifford Wierenga
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
julian.wierenga@usdoj.gov

Kirsten Elaine Wold
Hankey Law Office
kwold@hankeylaw.com